b

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| JERRY WAYNE DUNCAN, Plaintiff | CIVIL DOCKET NO. 1:17-CV-00890 |
| VERSUS | JUDGE DRELL |
| LIBBY TIGNER, *ET AL.*, Defendants | MAGISTRATE JUDGE PEREZ-MONTES |

REPORT AND RECOMMENDATION

Defendants Captain Warren James ("James"), Tim Price ("Price"), William Savage ("Savage"), and Megan Wike ("Wike") filed a Motion for Summary Judgment. ECF No. 57. Because there are no genuine issues of material fact that preclude a summary judgment in favor of Defendants, Defendants' Motion for Summary Judgment (ECF No. 57) should be GRANTED.

I. Procedural Background

Before the Court are a verified complaint and an amended complaint filed pursuant to 28 U.S.C. § 1983, *in forma pauperis*, by pro se plaintiff Jerry Wayne Duncan ("Duncan"). ECF Nos. 1, 34. The remaining defendants are Warren James (a security officer employed at Rivers Correctional Center ("RCC") in Ferriday, Louisiana), Timothy Price (a corrections officer employed at RCC), Warden William

Savage (assistant warden at RCC), and Megan Wike (a nurse employed in the RCC infirmary).[1]

Duncan contends Defendants denied him medical care for his serious medical needs when he suffered a stroke on February 21, 2016 while incarcerated in RCC. Duncan contends he has suffered debilitating permanent damage (inability to walk, a shortened life span, impaired vision, difficulty swallowing and talking, and pain) as a result of the five-day delay in medical care. Duncan seeks monetary damages. Duncan is presently incarcerated in Dixon Correctional Institute ("DCI") in Jackson, Louisiana.

Duncan also named Ricky Spinner, a DCI employee. However, Spinner was never served. Spinner is no longer employed at DCI and is no longer residing at his known forwarding address. ECF Nos. 39, 49. Accordingly, it is recommended that the complaint against Spinner be dismissed without prejudice pursuant to Fed. R. Civ. P. 4(m). *See McGinnis v. Shalala*, 2 F.3d 548, 550 (5th Cir. 1993), cert. den., 510 U.S. 1191 (1994); *Systems Signs Supplies v. U.S. Dept. of Justice*, 903 F. 2d 1011, 1013 (5th Cir. 1990); *Kersh v. Derosier*, 851 F.2d 1509, 1512 (5th Cir. 1988).

Defendants answered the complaint. ECF Nos. 13, 36, 41, 52. Defendants filed a Motion for Summary Judgment with depositions, affidavits, a statement of undisputed facts, and medical records. ECF Nos. 57, 60. Duncan filed a brief in opposition to that motion (ECF No. 62), to which Defendants replied (ECF No. 63).

---

[1] Defendants Libby Tigner, Jane Doe, and two John Does were voluntarily dismissed by Duncan. ECF Nos. 33, 34.

II. Law and Analysis

    A. Standards governing the Motion for Summary Judgment.

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Paragraph (e) of Rule 56 also provides the following:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.[2]

"A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *See Hefren v. McDermott, Inc.*, 820 F.3d 767, 771 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding a motion for summary judgment, a court must construe all facts and draw all inferences in the light most favorable to the non-movant. *See Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). However, a

---

[2] Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted unless the opposing party controverts those facts.

mere scintilla of evidence is insufficient to defeat a motion for summary judgment. *See Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir. 1999).

    B.    <u>**Eighth Amendment right to medical care in prison.**</u>

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Although the Eighth Amendment does not, by its precise words, mandate a certain level of medical care for prisoners, the Supreme Court has interpreted it as imposing a duty on prison officials to ensure that inmates receive *adequate* medical care. *See Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006)(citing *Farmer*, 511 U.S. at 832).

Under the Eighth Amendment, a lack of proper inmate medical care can be "cruel and unusual punishment" only if it is "sufficiently harmful to evidence deliberate indifference to serious medical needs." *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). First, the deprivation must be, objectively, sufficiently serious and the prison official's act or omission must result in the denial of the minimum civilized measure of life's necessities. Second, a prison official must have a sufficiently culpable state of mind–deliberate indifference to a prisoner's constitutional rights–to be subjected to § 1983 liability. *See Farmer*, 511 U.S. at 834. The Supreme Court defined "deliberate indifference" as "subjective recklessness," or a conscious disregard of a substantial risk of serious harm. *See Farmer*, 511 U.S. at 839.

4

To establish a constitutional violation, a plaintiff must show that the defendant: (1) was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (2) subjectively "dr[e]w the inference" that the risk existed; and (3) disregarded the risk. *See Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837). In describing the second element, the Supreme Court has emphasized that a "prison official cannot be found liable" unless she "knows of" an excessive risk to inmate health or safety. *See ibid.* A failure to act "unaccompanied by knowledge of a significant risk of harm" is insufficient to establish a constitutional violation. *See id.* at 837–38. It is not enough to identify a significant risk that the official "should have perceived but did not." *See id.* at 838.

"Deliberate indifference is an extremely high standard. A prisoner must first prove objective exposure to a substantial risk of serious harm–in other words, the prisoner must prove a serious medical need. Second, the prisoner must prove the officials' subjective knowledge of this substantial risk. Third, the prisoner must prove that the officials, despite their actual knowledge of the substantial risk, denied or delayed the prisoner's medical treatment. Finally, the prisoner must prove that the delay in or denial of medical treatment resulted in substantial harm." *Petzold v. Rostollan*, 946 F.3d 242, 248 (5th Cir. 2019) (footnotes omitted).

A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince

5

a wanton disregard for any serious medical needs. *See Easter v. Powell*, 467 F.3d 459, 463-464 (5th Cir. 2006) (citing *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)); *see also, Chapman v. Johnson*, 339 Fed. Appx. 446, 448 (5th Cir. 2009) (the fact that defendant was aware that inmate had a serious injury and was instructed to provide pain relief medication, but did not do so, could demonstrate an Eighth Amendment violation). Delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference which results in "substantial harm." *See Mendoza v. Lynaugh,* 989 F.2d 191, 195 (5th Cir.1993) (emphasis added); *Eugene v. Deville,* 2020 WL 424581, at *2 (5th Cir. 2020); *Choyce v. Velez,* 465 Fed. Appx. 367, 368 (5th Cir.2012); Stogner v. Tangipahoa Parish Sheriff's Office, 2014 WL 4425744, at *5 (E.D. La. 2014). "Pain suffered during the delay may constitute sufficient harm." *Eugene*, 2020 WL 424581, at *2 (citing *Easter v. Powell*, 467 F.3d 359, 464 (5th Cir. 2006) ("Easter clearly stated an Eighth Amendment violation with regard to the severe chest pain he suffered during the period of time Powell refused to treat him.").

C. <u>**Defendants' Motion for Summary Judgment should be granted.**</u>

Duncan contends he suffered a stroke on February 21, 2016 while he was incarcerated in RCC. ECF No. 34. Duncan further contends that unknown infirmary staff told him there was nothing wrong with him, and he was sent out. ECF No. 34. Duncan alleges the infirmary staff told him to stay in bed. ECF No. 1 at 3; No. 34. After five days of nausea, vomiting, pain, and numbness in his left side, Duncan was seen by a doctor. ECF No. 34. The doctor immediately sent Duncan to the nearest

6

hospital, Duncan was transferred to two more hospitals, then airlifted to New Orleans "for surgery." ECF No. 34.

Duncan alleges that, when he arrived at Oschner Hospital in New Orleans, he was told "the surgery" could not be done because too much time had passed since the stroke.[3] ECF No. 34. Duncan contends that, because of Defendants' deliberate indifference to his stroke and the five-day delay in providing him medical care, he is unable to walk, is nearly blind, has difficulty swallowing and talking, is in pain, and has a shortened life span.

Duncan's medical records show he went to the infirmary on February 22, 2016 complaining of vomiting for three days. ECF No. 24 at 3. LPN Wike found Duncan's pulse was 104, his blood pressure was 184/104, he denied any one-sided weakness, and his pupils were normal and reactive to light. ECF No. 24 at 3. Wike gave Duncan a Clonidine .1 mg and Phenergan 25 mg, and advised him to return to the clinic if his symptoms did not improve. ECF No. 24 at 3.

On February 23, 2016, Duncan returned to the medical clinic complaining of nausea and dizziness. ECF No. 24 at 4. Wike found Duncan's blood sugar was 99, his blood pressure was 170/104, and his pulse was 100. ECF No. 24 at 4. Duncan denied chest pain, abdominal pain, or one-sided weakness, and told Wike he had the same symptoms twice before due to inner ear problems. ECF No. 24 at 4. Wike again gave Duncan a Clonidine .1 mg and Phenergan 12.5 mg, and instructed him to return

---

[3] Duncan's statement that he arrived too late to undergo "surgery" is incorrect. Duncan did not receive thrombolysis (drugs or a mechanical thrombectomy to break down blood clots) due to the amount of time that had passed since his stroke.

7

to the clinic if his symptoms did not improve, so she could monitor his blood pressure. ECF No. 24 at 4.

On February 25, 2016, the registered nurse told Wike that Duncan had a possible cardiovascular accident or transient ischemic attack. The RN told Wike to send Duncan to the emergency room for evaluation and treatment. ECF No. 24 at 5.

At the emergency room on February 25, 2016, Duncan complained of left sided facial numbness, weakness, and dizziness for four days, and admitted he had not been eating. ECF No. 24-1 at 2-3, 5, 13. Duncan's heartrate was 93 bpm at 4 p.m., and 111 bpm at 6:30 p.m. ECF No. 24-1 at 4. Duncan was oriented; had normal speech, behavior and respiration; had no difficulty swallowing; and was nonambulatory. ECF No. 24-1 at 13. Duncan was diagnosed with cerebellar stoke syndrome. ECF No. 24-1 at 4. A CT scan showed the left cerebellar lobe with a 4 cm area of hypodensity/edema that was concerning for a subacute infarct. ECF No. 24-1, at 10.

Duncan was transferred to Rapides Regional Medical Center on February 25, 2016. ECF No. 24-1 at 11, 20. A transthoracic echocardiogram of Duncan's left ventricle showed systolic function was at the lower limits of normal, ejection fraction was estimated to be 50%, and he had moderately increased wall thickness and grade 1 diastolic disfunction. ECF No. 60-7 at 71. Duncan's left arm was moderately impaired (motor control and dysmetria), limiting bilateral activities, and he had weakness of the ocular muscles of the left eye with resultant diplopia, causing him to hold his left eye closed to reduce dizziness and double vision. ECF No. 60-7 at 73. Duncan was unable to stand due to severe dizziness, needed moderate assistance to

sit up, and was unable to tolerate sitting more than 3 minutes. EVF No. 60-7 at 74. Duncan's speech was clear and he could swallow. ECF No. 60-7 at 75.

An MR Angiography of Duncan's head showed no flow in most of the basilar artery and minimal signal in the proximal right vertebral artery. ECF No. 60-7 at 77. An MRI of his brain showed a large left inferior cerebellar CVA and very small right inferior mid cerebellar CVAs. ECF No. 60-7 at 79. A carotid duplex scan showed peripheral vascular atherosclerotic disease. ECF No. 60-7 at 80. Duncan was evaluated by a physician and diagnosed with cerebellar infarct, as well as hypertension, GERD, and hypothyroidism. ECF No. 60-7 at 86-87. Duncan was not a candidate for thrombolysis due to the "long duration of his symptoms." ECF No. 60-7 at 86.

Duncan was evaluated at Oschner Medical Center in New Orleans on February 26, 2016, and diagnosed with having suffered a stroke. ECF No. 32-1 at 28. Duncan reported that, on February 21, he suddenly felt hot from the backside of his head, had a syncopal episode, and fell. ECF No. 32-1 at 29. Duncan reported that, after he awoke, he had difficulty coordinating his left upper extremity, difficulty walking, numbness and tingling in the left side of this face, left facial droop, ptosis, diplopia, and vertigo, and that his voice used to be deeper. ECF No. 32-1 at 29. Duncan was found to have: diplopia; weak facial movement on the left lower side; palsy in the left upper side of his face; he was not able to walk; ataxia in the left side limbs; mild to moderate dysarthria; and dysphonia. ECF No. 32-1 at 30-31. Both the MRI and the CT showed a moderate area of acute infarction in the left inferior cerebellum, as well

9

as a likely area of infarct in the right inferior cerebellum. ECF No. 32-1 at 35. Duncan's risk factors for stroke were hypertension and smoking tobacco. Doc. 32-1, at 36. Duncan was diagnosed with basilar stenosis or occlusion with stroke, vertebral stenosis or occlusion with stroke, and left PICA occlusion. Doc. No. 32-1 at 31. As a result of the stroke, Duncan has disturbance of vision, facial weakness or droop, disturbance of sensation, and ataxia.[4] Doc. 32-1, at 31. Duncan was not a candidate for thrombolysis[5] because he was "outside of treatment window" and of advanced age. ECF No. 32-1 at 32.

Duncan was evaluated for physical therapy on February 27, 2016. ECF No. 32-1 at 39. Duncan complained of nausea and double vision. ECF No. 32-1 at 32. Duncan's fine motor coordination was impaired on the left, and the sensation was impaired on the left side of his face. ECF No. 32-1 at 32. Duncan was prescribed six weeks of physical therapy and an eye patch on his left eye to assist in the relief of

---

[4] "Uncoordinated movement is due to a muscle control problem that causes an inability to coordinate movements. It leads to a jerky, unsteady, to-and-fro motion of the middle of the body (trunk) and an unsteady gait (walking style). It can also affect the limbs. The medical name of this condition of ataxia. . . . Brain injuries or diseases that can cause uncoordinated movements include: . . . stroke or transient ischemic attack." See MEDLINEplus Health Information, Medical Encyclopedia: Ataxia, available at http://medlineplus.gov,ency/article/003198.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).

[5] Thrombolytic therapy is the use of drugs to break up or dissolve blood clots which are the main cause of both heart attacks and stroke. Thrombolytic medicines are approved for the emergency treatment of stroke and heart attack and, ideally, should be used within the first 30 minutes after arriving at the hospital for treatment. MEDLINEplus Health Information, Medical Encyclopedia: Thrombolytic therapy, available at http://medlineplus.gov/ency/article/007089 (a service of the U.S. National Library of Medicine and the National Institutes of Health).

10

diplopia. ECF No. 32-1 at 49-50. Duncan was also prescribed speech therapy. ECF No. 32-2 at 1-2.

Defendants show, through an affidavit from Assistant Warden Savage, that Savage was not present when Duncan suffered his stroke, and was unaware that Duncan had a stroke until February 25, 2016. ECF No. 60-3 at 1-2. Duncan alleges Warden Savage knew when Duncan had a stroke but told him a doctor was not available and he would not send him to a hospital. ECF No. 1 at 4. Duncan alleges pleaded to be sent to a hospital, but Savage refused. Savage states in his affidavit that Duncan never asked to be taken to a hospital, did not tell Duncan there was no doctor available, and did not refuse to take Duncan to a hospital. ECF No. 60-3 at 1-2.

According to Duncan, Lt. Price told him the Warden had ordered the infirmary staff not to help him, although he saw Duncan was unable to talk and was vomiting; Price only took Duncan's blood pressure and sent him back to the dorm. ECF No. 34 at 4. Defendants show through an affidavit from Price, a Lieutenant on night shift, that on February 24, 2016, Price conducted blood pressure and vital signs checks on Duncan, gave him .1 mg of Clonidine pursuant to standing orders, and advised Nurse Wike of the situation. ECF No. 58-6 at 1. Duncan's blood pressure was 175/109 and his pulse was 90. ECF No. 58-6 at 3. Price repeated the vitals check and medication again later on February 24; Duncan's blood pressure was 165/101 and his pulse was 103. ECF No. 58-6 at 1, 3; No. 60-7 at 7. Price did not see Duncan on February 21-23, and did not see him on February 25, when Duncan was transferred to a hospital.

11

ECF No. 58-6 at 2. Price states he did not believe Duncan had suffered a stroke and did not deliberately ignore his symptoms, but admits he has not had any training for diagnosing a medical condition. ECF No. 58-6 at 3. Price also states there were no orders from the Warden that prevented him from helping Duncan. ECF No. 58-6 at 2.

Duncan alleges Wike told him the Warden had ordered the infirmary staff not to help him, although she saw Duncan was unable to talk and was vomiting; Wike took Duncan's blood pressure and sent him back to the dorm. ECF No. 34 at 4. Defendants show, through an affidavit from Wike, that she was an LPN at RCC who was "qualified to treat offenders at RCC according to standing orders prepared by doctors." ECF No. 58-7 at 1. Wike stated in her affidavit that she "would determine if an offender needed to go to the hospital for additional medical care or treatment based on her observations, training, standing orders and, if called for, consultation with Dr. Hearn." ECF No. 60-5 at 1. After the stroke occurred on February 21, Wike saw Duncan for the first time on February 22, 2016. ECF No. 60-5 at 1. Duncan reported vomiting. ECF No. 60 at 15. Wike noted Duncan's pupils were normal and "checked his vital signs." ECF No. 60-5 at 1-2. Wike administered .1 mg of Clonidine and 25 mg of Phenergan and told Duncan to return if his symptoms worsened. ECF No. 60-5 at 2.

Wike saw Duncan again on February 23, 2016 and noted complaints of vomiting and dizziness. ECF No. 60-5 at 2. Wike repeated her previous treatment and placed Duncan's name on a list to be evaluated by the Nurse Practitioner. ECF

12

No. 60-5 at 2. On February 25, 2016, Wike was seen by Nurse Practitioner Boothe, who told Wike to have Duncan transported to a medical center for further evaluation. ECF No. 60 at 15; No. 60-7 at 10. Wike contends she never believed Duncan had suffered a stroke, she did not ignore his symptoms, and she provided Duncan with "treatment and care appropriate to the circumstances" based on her training, observations, his medical history, and the standing orders provided by physicians. ECF No. 60 at 15; No. 60-5 at 2.

Duncan alleges Captain James was aware that Duncan was having a medical problem, but kicked Duncan's leg and told him to get up because there was nothing wrong with him. ECF No. 34 at 4. Defendants show, through an affidavit from Captain James, that James did not know of Duncan's stoke until he was notified of Duncan's transfer on February 25, 2016. ECF No. 60 at 16; No. 60-6 at 1. James states he is not a medical professional; he did not participate in Duncan's treatment or diagnosis; and he never kicked Duncan's leg and told him to get up, or questioned whether he was sick. ECF No. 60-6 at 1-2.

Duncan contends Defendants intentionally denied him medical care for four days and delayed getting him medical care for his serious medical needs. But Defendants argue they were ignorant of the fact that Duncan needed medical care for a stroke. Defendants contend they did not know or believe that Duncan had suffered a stroke, and that Duncan was taken to the infirmary. Savage, Price, and James all point out that they have no medical training. For that reason, it is very strange that Officer Price was checking Duncan's vital signs and administering Clonidine to him.

However, it does not appear that Price, Savage, or James denied or delayed Duncan's access to medical care.

Wike contends she gave appropriate medical care in accordance with her "training" and the standing protocol orders from "a doctor." Wike is an LPN who, by definition and by law, is supposed to work under the *direct supervision* of a physician or registered nurse.[6] She is not supposed to be making diagnoses or decisions about medical care. Although there are, apparently, some standing orders written by an unnamed physician that Wike follows at her discretion, those "orders" are clearly not universal. Wike was unable to recognize the signs of a stroke. While those signs may not have been obvious to persons with little or no medical training, such as Defendants, they were apparently obvious and clear to the RN and the physicians who saw Duncan when he was finally taken for outside medical care.

---

[6] Under Louisiana law, a licensed practical nurse is not qualified or authorized by her license to make a diagnosis or prescribe medication. An LPN must work under the supervision of either a registered nurse or a medical doctor. The practice of practical nursing is defined in La. R.S. 37:961(b):

> (4) "Practice of practical nursing" means the performance for compensation of any acts, not requiring the education, training, and preparation required in professional nursing, in the care, treatment, or observation of persons who are ill, injured, or infirm and for the maintenance of the health of others and the promotion of health care, including the administration of medications and treatments or in on-job training or supervising licensed practical nurses, subordinate personnel, or instructing patients consistent with the licensed practical nurse's education and preparation, <u>under the direction of a licensed physician</u>, optometrist, or dentist acting individually or in his capacity as a member of the medical staff, or <u>registered nurse</u>. The licensed practical nurse may perform any of the foregoing duties, and with appropriate training may perform additional specified acts which are authorized by the Louisiana State Board of Practical Nurse Examiners when directed to do so by the licensed physician, optometrist, or dentist acting individually or in his capacity as a member of the medical staff, or registered nurse.

See also Louisiana State Board of Practical Nurse Examiners: Scope of Practice @http://www.lsbpne.com/scope—of—practice.htm.

Wike and the Defendant corrections officers do not have medical educations, did not realize the severity of Duncan's medical problem, did not recognize the signs of a stroke, and thus did not send Duncan out for medical care. To her credit, Wike immediately placed Duncan on the "list" to see the RN, who appeared on February 25, 2016. The fact that the RN recognized Duncan's symptoms and immediately suspected a stroke or TIA indicates that Duncan's symptoms were clear to someone with medical training. There is no indication that the named Defendants actually knew Duncan was having a stroke and were deliberately indifferent to Duncan's serious medical needs.[7]

In his complaint, Duncan alleged that Warden Spinner and Warden Savage told him there was no doctor available and he was not going to be taken to a hospital. ECF No. 1 at 4; No. 4 at 4. Duncan further alleged that Price and Wike told him they could not do anything for him on order from the wardens. ECF No. 1 at 4; No. 4 at 4. However, in his deposition, Duncan stated that someone else had written his complaints. ECF No. 58-4 at 12. Duncan did not recall the wardens telling him there was no doctor available to see him. ECF No. 58-4 at 12-13. Duncan also stated he did not recall Price or Wike telling him the wardens had told them not to treat him. ECF 58-4 at 17. In their affidavits, Savage, Price, and Wike all denied telling Duncan he would not be treated. ECF No. 58-5 at 2; No. 58-6 at 2; No. 58-7 at 2.

Although Duncan has shown he had a stroke on February 21, 2016, for which he inappropriately did not receive medical care until February 25, 2016, Duncan has

---

[7] The prison administration's reliance on corrections officers and an LPN to make medical decisions and give medical treatment is unreasonable.

15

not shown the named Defendants refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any other conduct that demonstrates deliberate indifference to his serious medical needs.

Nor does the record show the delay in medical care caused substantial harm to Duncan. Duncan had an unforeseen stroke and suffered substantial harm from it. There is nothing in the record that shows the delay in medical treatment made Duncan's condition worse than it was immediately after the stroke.

The medical records show Duncan was given some treatment each day by the Defendants. Whether it was the right treatment administered by the right people is a different issue. The named Defendants afforded Duncan the care they believed was appropriate according to their very limited training and experience. There is no evidence that the named Defendants were deliberately indifferent to Duncan's serious medical needs.

Because there are no genuine issues of material fact as to whether Defendants James, Price, Savage, and Wike were deliberately indifferent to Duncan's serious medical needs, Defendants' Motion for Summary Judgment (ECF No. 57) should be GRANTED.

### III. Conclusion

Because there are no genuine issues of material fact as to whether Defendants James, Savage, Price, and Wike were deliberately indifferent to Duncan's serious medical needs, Defendants' Motion for Summary Judgment (ECF No. 57) should be GRANTED and Duncan's action should be DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. No other briefs (such as supplemental objections, reply briefs, etc.) may be filed. Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this __7th__ day of February, 2020.

_____
Joseph H.L. Perez-Montes
United States Magistrate Judge